**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN VERBA and CHRISTINE VERBA,<br><br>Plaintiff,<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>Defendants. | C.A. NO.: 2:17-cv-769 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD**

**INTRODUCTION**

The Court should uphold the denial of Accidental Death & Dismemberment (AD&D) benefits under the "arbitrary and capricious" standard of review and enter summary judgment in favor of Metropolitan Life Insurance Company (MetLife). The administrative record supports MetLife's conclusion that the Andrew Verba's (herein referred to as "participant" and/or "decedent") plan was not obligated to pay AD&D benefits because the participant voluntarily consumed cocaine and alcohol and this combination "caused or contributed" to his death. Among other substantial evidence, the record demonstrates that a forensic pathologist in the Coroner's Office (a) found crack cocaine and a crack pipe in decedent's possession, (b) toxicologically determined that cocaine and alcohol were present in his blood, and (c) concluded that decedent's "immediate" cause of death was "combined drug poisoning (Cocaine and Ethanol)." In addition, the record demonstrates that decedent engaged in bizarre behavior in the moments leading up to his death. Among other things, decedent drove off with a suspended driver's license at 1:30 in the morning on a cold March night, later parked the car in a complete

1

stranger's driveway located less than 2 miles from where he lived, walked through the stranger's backyard and into a creek that ran behind the property, emerged on the other side, and while walking through the woods began stripping off his clothes until he was almost completely naked. He was found in the prone (face down) position. Apparently he was incapable of concluding that he might find warmth or relief by returning to the car he had just parked or by seeking assistance from the homeowner on whose property he had trespassed (or by just driving back home).

The decedent's parents, who are the beneficiaries of participant's ERISA plan benefits, offer no meaningful response to the evidence outlined above. Without disputing the above facts, they argue that the only cause of death was hypothermia. But the evidence overwhelmingly shows that *if* hypothermia played any role in participant's death, it was not the "Direct and Sole" cause as required by the Plan, but rather was merely a consequence that flowed from (*i.e.*, was caused or contributed to by) participant's combination of drugs and alcohol. The balance of plaintiffs' argument rests on pure speculation about "possible" criminal behavior that was completely contradicted by police report and other parts of the record.

For each of these reasons and the reasons set forth more fully herein, MetLife respectfully requests summary judgment in its favor.

## FACTS

MetLife respectfully refers the Court to Defendant's Statement of Undisputed Material Facts (cited herein as "SOF ¶__").

2

**ARGUMENT**

I.  **The Court Should Apply the Deferential "Arbitrary and Capricious" Standard of Review to MetLife's Decision**

The Court should apply the deferential "arbitrary and capricious" standard of review. The Plan grants "discretionary authority" to MetLife. SOF ¶¶ 5-6. When the ERISA plan grants the defendant discretion, "[t]he court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 233-34 (3d Cir. 2009) (quoting *Abnathya v. Hoffman La Roche*, 2 F.3d 40, 45 (3d Cir. 1993)). Rather, the court must apply a deferential "arbitrary and capricious" standard of review. *Doroshow*, 574 F.3d at 233. A benefits decision is arbitrary and capricious only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law. *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 527 (3d Cir. 2009).

In the world of accidental death benefits, claims reviewers like MetLife often must make benefit decisions with less than perfect and sometimes conflicting information that might support a different conclusion. However, that does not change the standard of review; the court continues to ask whether in light of the conflicting information the claims reviewer had a reasonable basis for its conclusion. *See*, *e.g.*, *Nally v. Life Ins. Co. of No. Am.*, 299 Fed. Appx. 125, 130 (3d Cir. 2008) ("[t]here was evidence consistent with the proposition that Mr. Nally was hypoglycemic at the time of his accident and that his hypoglycemia caused the accident. That it may be impossible to prove decedent was hypoglycemic at the moment of his accident does not mean that LINA's decision does not survive moderately heightened arbitrary and capricious review.") (applying the old and now-rejected "sliding scale" standard of review); *Malin v. Metro. Life Ins. Co.*, 845 F. Supp. 2d 606, 615 (D. Del. 2012) ("This Court notes that we may never know what Mr. Malin's true intent was on the early morning of February 21,

2009. The facts in the record could potentially permit multiple conclusions. However, two independent factfinders have previously considered the circumstances and concluded that Mr. Malin intended to kill himself when he pulled the trigger the second time: first, the Delaware Assistant Medical Examiner, and second, the claims administration team at MetLife. Under the terms of Mr. Malin's insurance Plan and ERISA caselaw, this Court is not permitted to reevaluate those decisions on a blank canvas at this stage. Instead, this Court's role is limited to determining whether MetLife's conclusion was arbitrary and capricious. As explained above, the Court has found that it was not.").

Plaintiffs allege in their complaint that because MetLife pays benefits from its own account with respect to this Plan (which MetLife admits is true), a *de novo* standard of review applies.[1] The Supreme Court has twice rejected the argument that an alleged conflict changes the standard of review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115-16, 128 S. Ct. 2343, 2350 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 9557 (1989); *see also Dowling v. Pension Plan for Salaried Employees of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 250 (3d Cir. 2017) ("a conflict on its own does not change our standard of review -from deferential to de novo."). Rather, the alleged conflict is weighed as a factor in assessing whether MetLife abused its discretion.[2] *Id.*

Plaintiffs also suggest that the structural conflict must be weighed against MetLife. However, the Third Circuit gives weight to a structural conflict only when there is evidence that

---

[1] D.E. 1, ¶¶ 45-47; D.E. 11, ¶¶ 45-47.

[2] At the October 5, 2017 Rule 16 conference, plaintiff's counsel raised the issue of conflict discovery. Defendant's counsel argued such discovery was not as of right and also explained that no discovery was needed because MetLife's answer admits that it decides whether to approve or deny claims and pays benefits. *See* D.E. 11, ¶ 45. Plaintiffs' counsel withdrew the issue. Indeed, the Court's scheduling order does not provide for discovery and directs the parties to proceed directly to summary judgment if mediation is unsuccessful. D.E. 15.

4

it actually affected the benefits decision, or where it is "one last straw" that calls a benefit determination into question. *See Dowling*, 871 F.3d at 251. Here, there is no evidence that the $75,000 amount of AD&D benefits played any role in MetLife's decision. Notably, MetLife paid the same beneficiaries the same exact amount ($75,000) on their claim for the decedent's GLI benefits. SOF ¶¶ 27-28. Nor does this case present even *one* straw—let alone "one last straw"— that calls the benefit determination into question: as shown below, and during the administrative proceedings, the parties clearly agreed on what documents should be considered; MetLife simply reached a well-supported, rational conclusion that differed from the theories advanced by plaintiffs' attorneys and the physician they retained to review the exact same documents. That the parties reached different conclusions from the same underlying reports is not evidence that MetLife's decision was arbitrary, capricious, procedurally unfair, or conflicted. Accordingly, there is nothing in the administrative record (or anywhere else) demonstrating that this structural issue affected the benefits decision or otherwise calls the determination into question. *See Glenn*, 554 U.S. at 117, 128 S. Ct. at 2351; *Dowling*, 871 F.3d at 251. The Court should give the structural conflict no weight. *See Dowling,* at 252 (the "bare existence [of a structural conflict] is not enough to justify disturbing the plan administrator's otherwise reasonable decision.").

## II. METLIFE'S DETERMINATION THAT THE PLAN EXCEPTION APPLIES IS RATIONAL AND WELL-SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE ADMINISTRATIVE RECORD

MetLife properly exercised its "discretionary authority"[3] in reaching its conclusion that the Plan did not provide AD&D benefits to the beneficiaries. In order for AD&D benefits to be payable, an accident must be the "Direct and Sole Cause" of the loss. SOF ¶ 29. The Plan

---

[3] SOF ¶ 6.

defines Direct and Sole Cause to mean "that the Covered Loss was a direct result of the accidental injury, *independent of other causes*." *Id.* (emphasis added). In addition, the Plan does not pay AD&D benefits "for any loss caused or contributed to by… .8. the voluntary intake or use by any means of: … alcohol in combination with any drug, medication, or sedative." *Id.*

MetLife's conclusion that the decedent's death was caused or contributed to by his voluntary consumption of drugs and alcohol, and its rejection of the theory that hypothermia was sole "Direct and Sole Cause" of death, were rational and supported by substantial evidence in the administrative record. Among other things, (A) it is undisputed (and medically indisputable) the decedent voluntarily consumed alcohol and cocaine, (B) there is substantial undisputed evidence demonstrating that this combination "caused or contributed" to his death, and (C) the report plaintiffs submitted in support of their "hypothermia only" theory failed to account for the substantial evidence of drug and alcohol use, failed to consider and apply the Plan language, and contained speculation and inaccuracies.

    **A.    It Is Indisputable (and Undisputed) that the Decedent Voluntarily Combined Alcohol with Illegal Drugs (and Apparently, with Other Medications and Sedatives)**

MetLife's October 2016 letter to plaintiffs states that the decedent consumed cocaine, "a drug that cannot be prescribed, [ ] in conjunction with alcohol". SOF ¶ 35. MetLife's conclusion is supported by indisputable medical and other evidence. The Coroner's Report identifies the following toxicological test results:

    A.    Cocaine: 180 ng/ml in the blood; present in the urine

        1.    Benzoylecgonine: 770 ng/ml in the blood

        2.    Cocaethylene: 91 ng/ml in the blood

    B.    Ethanol: 0.050% in the blood

    C.    Benzodiazepines: present in the urine

D.  Cannabinoids: present in the urine

SOF ¶ 21. Cocaine is an illegal <u>drug</u>. Its presence in the decedent's blood is confirmed here in toxicological findings A, A(1), and A(2). Its presence is also supported by the fact that the decedent was found with a crack pipe and crack cocaine in his possession. SOF ¶¶ 18-19. Significantly, the report makes a related finding (A(2)) of cocaethylene in the decedent's blood and urine. SOF ¶ 21. Cocaethylene is a metabolite that is created **_only_** when individuals concurrently consume alcohol **_and_** cocaine.[4] SOF ¶ 23. Given the finding of cocaethylene, the toxicological analysis not surprisingly also reveals the presence of Ethanol, *i.e.*, alcohol (Finding "B"). SOF ¶ 21. Accordingly, MetLife's determination that the decedent voluntarily consumed cocaine with alcohol is based on substantial and undisputed evidence.[5]

**B. Substantial and Undisputed Evidence Supports MetLife's Conclusion that the Combination of Drugs and Alcohol "Caused or Contributed" to the Participant's Death.**

Decedent's Plan does not pay benefits when the consumption of drugs and alcohol causes or contributes[6] to the loss. SOF ¶ 29. MetLife properly concluded that the "loss was caused by and contributed to by the use of [cocaine,] a drug that cannot be prescribed, taken in conjunction with alcohol…," and that this combination of drugs and alcohol "le[d] to [the decedent's]

---

[4] The other metabolite found, Benzoylecgonine, is created only when individuals use cocaine. SOF ¶ 22.

[5] There is also evidence that the decedent combined alcohol with other illegal drugs and un-prescribed medications (sedatives). For example, Benzodiazepines (Finding "C") are medications used as a sedative and require a prescription. Likewise, Cannabinoids (Finding "D") are compounds found in marijuana. The use of the psychoactive drug marijuana is illegal in Pennsylvania, unless prescribed by a physician. Alcohol and these other drugs, medications, and sedatives were all present in decedent's system at the same time.

[6] The Plan does not define "cause or contribute". The ordinary definition of "cause" is "make (something, especially something bad) happen," and the ordinary definition of "contribute" is "help to cause or bring about". *See* https://en.oxforddictionaries.com.

prolonged exposure to a cold environment."  SOF ¶ 35.  Substantial evidence supports these conclusions, including the Coroner's Report, the Death Certificate, and the Police Report.[7]

The Coroner's Report provides substantial and compelling evidence to support a conclusion that drugs and alcohol caused or contributed to the participant's death.  Pennsylvania coroners are charged with the legal duty to determine the cause of death, including in cases involving drugs and alcohol.  16 P.S. §§ 1237(a), (a)(1), (a)(2), (a)(4), (b).  They are part of the Commonwealth's criminal investigation team.  *Com. v. Anderson*, 253 Pa. Super. 334, 347-48, 385 A.2d 365, 371-72 (1978) (citing 16 P.S. §§ 1237, 1242).  They are also authorized to issue death certificates,[8] which must contain a determination of a single, "immediate cause" of death.[9]  Here, a forensic pathologist (a physician) in the Beaver County Coroner's Office performed an investigation that included (a) a field investigation, (b) discovery of a crack pipe and crack cocaine rocks in the decedent's clothing, (c) a toxicological analysis, and (d) an autopsy.  SOF ¶¶ 17-21.  After conducting this investigation, the forensic pathologist exercised his medical judgment as to cause of death.[10]  SOF ¶ 24.  His medical judgment, recorded in the Coroner's Report, is that the participant died "as a result of a combined drug poisoning (Cocaine and Ethanol), along with hypothermia."[11]  SOF ¶ 24.  In addition, the Death Certificate likewise identifies the sole "immediate" cause of death as "Combined Drug Poisoning."  SOF ¶ 25.  It

---

[7] Plaintiffs cannot legitimately question MetLife's decision to base its benefits determination on documents such as the Coroner's Report (including toxicological results), the Police Report, and the Death Certificate.  They provided the exact same documents to Dr. Shane, the physician who submitted a letter on their behalf.  MetLifeAR000111 (listing documents reviewed).

[8] 16 P.S. § 1244.

[9] *See* MetLifeAR000022 at line 25.

[10] Coroner Report at MetLifeAR000023.

[11] The forensic pathologist down-played the role of hypothermia, stating that his findings included "POSSIBLE HYPOTHERMIA".  SOF ¶ 21.

8

was perfectly reasonable for MetLife to rely on the judgment of a forensically-trained physician who had the legal duty to determine the cause of death and who was directly involved in the forensic investigation.[12]  *See Malin*, 845 F. Supp. 2d at 613 (opinion of medical examiner is one on which an insurance company can reasonably rely in making a coverage determination); *see also Lake v. Aetna Life Ins. Co.*, 54 F. Supp. 2d 331 (D.N.J. 2014) (not unreasonable for insurance company to rely on toxicological report).

The Police Report also supports MetLife's conclusion.  The Police Report documents the decedent's bizarre behavior leading up to his death.  Among other things, it contains information demonstrating that:

- The decedent drove off in his girlfriend's car at 1:30 in the morning, apparently with a suspended driver's license, SOF ¶¶ 10-12, 15;

- Sometime later, the decedent parked the car in a stranger's driveway located less than two miles from his own home, SOF ¶¶ 13-14;

- He got out of his car, walked through the stranger's backyard, and then walked into a freezing cold creek while fully clothed, SOF ¶¶ 16-17; and

- Rather than return to the warmth of the car or the nearby residence, and rather than drive himself home, he proceeded further into the woods, stripping off clothing as he went. *Id.*

In addition, the Police Report repeatedly rejects foul play.  It identifies the "Number of Offenders [as] 0"; and explains that state and local police officers investigated but found there were "no signs of any struggle" and "no signs of criminal activity".  SOF ¶ 26.  The Coroner's Office likewise ruled out foul play by determining the immediate cause of death was "Combined Drug Poisoning."  SOF ¶¶ 24, 25.

---

[12] The coroner's report is an "official record and paper" under the County Code. 16 P.S. § 1251; *Penn Jersey Advance, Inc. v. Grim*, 599 Pa. 534, 962 A.2d 632 (2009).

9

The additional evidence concerning decedent's behavior (and the absence of even a hint of third-party criminal activity) further supports MetLife's determination that the decedent's voluntary drug and alcohol use poisoned and impaired decedent and thus "caused … and contributed to" "his prolonged exposure to a cold environment" and death.[13] SOF ¶ 35. The Plan does not pay benefits in such circumstances. SOF ¶ 29.

### C. MetLife Properly Rejected the Speculative Theories Offered by Dr. Shane

In connection with their appeal, plaintiffs submitted—and MetLife analyzed—a letter from Dr. John Shane. SOF ¶¶ 33-35. Dr. Shane theorizes that the sole cause of death was hypothermia.[14] *See* SOF ¶ 36. As an initial matter, Dr. Shane's alternative and competing theory does not change the standard of review. The Court continues to ask whether the defendant had a rational conclusion supported by substantial evidence; if so, then it does not matter whether a different explanation is also reasonable. *See Nally,* 299 Fed. Appx. at 130 (fact that it may be impossible to prove participant was hypoglycemic does not mean defendant's decision was an abuse of discretion); *Malin,* 854 F. Supp. 2d at 615 (defendant's decision not an abuse of discretion, notwithstanding that that facts "could potentially permit multiple conclusions."). In any event, Dr. Shane's letter is entirely unreasonable and contradicted by the record. It contains irrelevancies, speculation, and inaccuracies. MetLife acted well within its discretionary authority in rejecting it. SOF ¶¶ 6, 35.

First, Dr. Shane narrowly focuses on whether the measured levels of cocaine in the participant's blood were sufficient to "cause" a fatality (overdose).[15] But cause is not the sole

---

[13] MetLifeAR000118.

[14] MetLifeAR000112.

[15] MetLifeAR000112 (theorizing, that the amount of cocaine could not be "a *cause* of death") (emphasis added).

10

test for exclusion under the Plan. The Plan Document does not pay benefits when drugs and alcohol cause *or contribute* to the loss. SOF ¶ 29. And, MetLife did not base its denial solely on the "cause" element. MetLife's denial letter concludes that the "loss was caused by <u>and</u> contributed to by the use of a drug that cannot be prescribed, taken in conjunction with alcohol." SOF ¶ 35. As described above, MetLife's conclusion is well-supported by the record. Dr. Shane's letter shows he was not given— and thus failed to consider or address— the language of the Plan.[16] His hypothermia theory is irrelevant and incomplete.

Second, Dr. Shane fails to consider the Plan's basic requirement that the accidental injury (which Dr. Shane posits is hypothermia) be the "Direct *and Sole*" cause of death.[17] SOF ¶¶ 21, 35 (emphasis added). MetLife specifically concluded that hypothermia "was not the sole cause of death." SOF ¶ 35. As MetLife noted, the Coroner determined the cause of death to be combined drug poisoning, and identified it as the "immediate" cause of death, listing hypothermia as a "possible" secondary cause. SOF ¶¶ 21, 35. And, there is substantial evidence to support MetLife's conclusion that hypothermia was a *consequence* of the decedent's use of drugs and alcohol, and not the independent cause of his death. *See* Argument Part II(B), *supra*.

Third, Dr. Shane relies on speculation to support his hypothermia theory. He (a) says the trauma to the decedent "*suggests* a physical altercation," (b) imagines a "*possible* robbery" at a casino, and (c) further speculates that the decedent "*possibly* proceed[ed] to the place where he

---

[16] Dr. Shane's letter reveals that he received the Police Report, Coroner's Report, toxicology results, and the death certificate, which are the same documents MetLife received and reviewed. MetLifeAR000111.

[17] MetLifeAR000239; *see also* MetLifeAR000056, 000058, 000117 (quoting "sole and direct" requirement). In analogous circumstances, the Third Circuit recently determined that where the evidence supported the claims administrator's conclusion that excluded mental disorders "caused or contributed" to plaintiff's disability, the plaintiff was required to show that "physical conditions *alone*" caused her disability in order to receive benefits. *Davies v. First Reliance Std. Life Ins. Co.*, App. No. 17-1782, 2017 U.S. App. LEXIS 22656, at *5 (3d Cir. Nov. 13, 2017) (italics in original).

was found in order to hide from his assailants."[18] Dr. Shane's speculation is unsupported and in fact contradicted by the very reports he claims to have reviewed. For example, there is no evidence in the administrative record that establishes that on March 2 the decedent actually traveled to any casino, let alone came across any "assailants." Similarly, the police and coroner determined there was no evidence of criminal activity or third party involvement. SOF ¶¶ 21, 24, 26. Dr. Shane's letter does not address these official assessments concerning the absence of criminal activity. [19]

In similar fashion, Dr. Shane attempts to support his speculative hypothermia theory by misrepresenting the nature of the alleged "trauma" identified in the Coroner's Report. The Coroner's Report almost exclusively describes "abrasions" and "scratches" to the upper and lower extremities (which would be consistent with an impaired individual walking through the woods at night with no clothing).[20] The Report does not identify *any* injury to the "face and head" except for "pressure mark[s]" on the "left side of the face" and the "left forehead" (which would be consistent with a body in the "prone position" (face down) in the woods for a substantial period of time).[21] Dr. Shane does not address these specific findings in his letter, and he cannot seriously claim he has a better understanding of the alleged trauma to the decedent than the forensic pathologist who actually inspected the body.

---

[18] MetLifeAR000112 (emphases added.) And, in quoting from the Coroner's Report, even Dr. Shane seems to agree there is only "*possible hypothermia*." *Id.*

[19] In addition, Dr. Shane's "Pittsburgh assailants" theory ignores basic facts about the only location that the decedent is known to have visited, *i.e.*, 123 Veka Drive. *See* SOF ¶¶ 13, 37a to 37c. The remote location in which the sole resident was a stranger to the participant suggests the participant was looking for privacy, not seeking help. *See id.*

[20] Coroner's Report at MetLifeAR000026-28.

[21] Coroner's Report at MetLifeAR000023 (at II(A)) and Coroner's Report at MetLifeAR000028.

Fourth, Dr. Shane misreads the administrative record. He claims the police destroyed the "white rocks" found in the decedent's possession "without [any] analysis."[22] But the Police Report states that the police field tested the white rocks and determined they were cocaine. SOF ¶¶ 18-19.

At bottom, Dr. Shane failed to read (let alone analyze) the Plan language and based his hypothermia theory on rampant speculations and on other propositions that contradicted the facts in the administrative record. MetLife was not obligated to give any serious weight to Dr. Shane's hypothermia theory, particularly where MetLife had substantial evidence to support its different conclusions.

## CONCLUSION

MetLife's conclusions—which are entitled to review under the arbitrary and capricious standard—were rational and supported by substantial evidence in the administrative record. For each of the foregoing reasons, MetLife respectfully requests that this Honorable Court grant its motion and enter summary judgment in its favor.

REGER RIZZO & DARNALL LLP

Date: January 19, 2018

By: /s/ *James L. Griffith, Jr.*
James L. Griffith, Jr., Esquire
Attorney I.D. #74126
Cira Centre, 13th Floor
2929 Arch Street
Philadelphia, PA 19104-2899
(215) 495-6500
jgriffith@regerlaw.com

Attorney for Defendant, Metropolitan Life Insurance Company

---

[22] MetLifeAR000111.