IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**JON VERBA** and **CHRISTINE VERBA**, )
                                    )
      Plaintiffs,           )
                                    )
  v.                                    )      2:17cv769
                                    )      **Electronic Filing**
**METROPOLITAN LIFE INSURANCE** )
**COMPANY**, )
                                    )
      Defendant.          )

**MEMORANDUM OPINION**

August 22, 2018

**I.    INTRODUCTION**

      Plaintiffs Jon Verba and Christine Verba (the "Verbas" or "Plaintiffs") filed this action against Defendant Metropolitan Life Insurance Company ("MetLife") pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(b). ECF No. 1. Plaintiffs seek payment of life insurance proceeds as beneficiaries under an Accidental Death Insurance policy issued to their son, Andrew Jon Verba ("Andrew"). Presently before the Court are the parties' cross-motions for summary judgment. ECF Nos. 19 & 24. As explained below, Plaintiffs' motion for summary judgment will be denied, and Defendant's motion for summary judgment will be granted.

**II.    STATEMENT OF THE CASE**

      On March 3, 2016, at approximately 5:30 PM, a Pennsylvania State Police helicopter searching for a missing person sighted the body of Andrew Jon Verba in Marion Township near the Connoquenessing Creek. Incident Investigation Report, Marion Township Police Department, Mar. 3, 2016, attached to Declaration of Pati Ann Casey, Jan. 11, 2018 (ECF No. 19-2, at 41-42). The Police helicopter was searching the area because a resident had notified

police that an unidentified vehicle was in her driveway. *Id.* at 40. The vehicle was registered to Andrew's girlfriend and the police contacted her, but she disclaimed any knowledge of how the car got to where it was found. *Id.* at 41. After speaking to the police, she contacted Andrew's brother who then went to where the police said the vehicle was located and asked the owner of the home if he could search the property to look for Andrew. *Id.* The resident of the home then called the police to tell them that the brother had arrived on her property to look for his missing brother. *Id.*

The investigating police officers "found no signs of criminal activity" at the scene. *Id.* at 42. The officers recovered Andrew's wet clothing along the trail leading to Andrew's body. It appeared to the officers that "[Andrew] had entered the creek [behind the] residence where the vehicle was recovered and exited on other side of creek where he then proceeded to walk along the trail stripping off wet clothing as he walked." *Id.* Examination of Andrew's body revealed that he was carrying a crack pipe and two small white colored rocks, which field testing indicated positive for cocaine. *Id.* The Police Report notes that the Autopsy Report and Toxicology Report from the Beaver County Coroner's Office "confirmed that [Andrew's] manner of death was Accidental as a result of a combination of drug poisoning (Cocaine and Ethanol) and Hypothermia." *Id*

Toxicology tests performed by the Beaver County Coroner's Office were positive for Cocaine at 180 ng/ml; Benzoylecgonine at 770 ng/ml; Cocaethylene at 91 ng/ml; and Ethanol at 0.050%. Coroner's Report, Mar. 4, 2016, attached to Casey Decl. (ECF No. 19-2, at 26). The report also indicates a positive result for Benzodiazepines and Cannabinoids in the urine. *Id.* In his Report, the Forensic Pathologist opined that Andrew "died as a result of a combined drug poisoning (Cocaine and Ethanol) along with hypothermia," and that the manner of death was "Accidental." *Id.* Andrew's Pennsylvania Certificate of Death lists the "Immediate Cause" of

2

death as "Combined Drug Poisoning" and "Hypothermia." Certificate of Death, Mar. 28, 2016 – ECF No. 19-2, at 25.

Andrew was an employee of Giant Eagle, Inc. and participated in the company's "Group Life Insurance Plan for Giant Eagle, Inc. and Subsidiaries," Group Number 0160660 (the "Plan" or "Plan Document"). "Your Benefit Plan," July 1, 2015, attached to Casey Decl. (ECF No. 19-2, at 200-255). The benefits provided for in Giant Eagle's Plan are insured by Metropolitan Life Insurance Company. ECF No. 252. The Plan provides participants with benefits of $75,000 in "Basic Life Insurance" and $75,000 in "Accidental Death and Dismemberment Insurance." ECF No. 19-2, at 223-224.

The Plan documents provide that MetLife has the authority to approve or deny claims. ECF No. 19-2, at 247-48 & 253-254. As a Plan Fiduciary, MetLife has discretionary authority as follows:

**Discretionary Authority of Plan Administrator and Other Plan Fiduciaries**

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

ECF No. 19-2, at 254.

Andrew's parents, Jon and Christine Verba, were beneficiaries under Andrew's Giant Eagle Plan. As beneficiaries they applied for life insurance benefits and accidental death and dismemberment benefits under Andrew's Plan. Met Life paid the Verbas $75,000 in life insurance benefits, and denied the claim for accidental death and dismemberment benefits. *See* Letters from MetLife to C. Verba and J. Verba, May 18, 2016, attached to Casey Decl. (ECF No.

19-2, at 59-60, 60-61). In denying the claim, MetLife explained that the ERISA Plan provides for payment of insurance proceeds as follows:

> "If You sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the SCHEDULE OF BENEFITS, Proof of the accidental injury and Covered Loss must be sent to Us. When We receive such Proof We will review the claim and, if We approve it, will pay the insurance in effect on the date of the injury.
>
> **Direct and Sole Cause** means that the Covered Loss was a direct result of the accidental injury, independent of other causes."

ECF No. 19-2, at 59 & 61 (quoting Plan Document, ECF No. 19-2, at 242). The denial letters further set forth the Plan's Exclusion as follows:

> "We will not pay benefits under this section for any loss caused or contributed to by . . . .
>
> 8. the voluntary intake or use by any means of:
>
> - Any drug medication or sedative, unless it is:
>   - Taken or used as prescribed by a Physician; or
>   - An 'over the counter' drug, medication or sedative taken as directed,
> - Alcohol in combination with any drug, medication, or sedative."

*Id.* (*see* Plan Document, ECF No. 19-2, at 242-43). Finally, MetLife explained the denial of the claim as it relates to the Exclusion as follows:

> According to our records, the State of Pennsylvania Certificate of Death lists the immediate cause of Andrew J. Verba's death on March 3, 2016 as "Combined Drug Poisoning" due to or as a consequence of "Hypothermia". The Coroner's Report indicates that Mr. Verba was found to have Cocaine and Alcohol in his blood at the time of death leading to his prolonged exposure to a cold environment. As the loss was caused by and contributed to by the use of a drug that cannot be prescribed, taken in conjunction with alcohol, the loss is not eligible as Accidental under the Plan terms.
>
> Therefore, based on the record before MetLife, we must deny your claim. *Id.* at

59-60 & 61-62.

4

On June 25, 2016, the Verbas, now represented by counsel, requested a review of the denial. Letter from C. Katz to MetLife, June 25, 2016, attached to Casey Decl. (ECF No. 19-2, at 105). In support of challenging the denial of their claim, the Verbas' attorney supplemented the request for review a letter from John Shane, M.D. Letter from J. Shane to C. Katz, July 15, 2016, attached to Casey Decl. (ECF No. 19-2, at 114-15). The Verbas did not submit any other documents in support of the request for review

Dr. Shane reviewed the Police report, the Death Certificate, the Coroner's report, and the Autopsy report with toxicology results. *Id.* at 114. Dr. Shane stated that the level of cocaine in Andrew's body was "completely inconsistent with overdose," and "completely inconsistent with cocaine as a cause of death." *Id.* at 115. He further stated that the level of alcohol found indicates "a small amount of alcohol consumption," suggesting "2 drinks." *Id.* He opined that Andrew's death was "certainly not a drug or alcohol related death" and that Andrew "certainly was capable of driving his vehicle . . . ." *Id.* He further stated that Andrew was likely assaulted, escaped to hide from his assailants, and ultimately died due to hypothermia. *Id.*

By letter dated October 18, 2016, MetLife upheld the denial of the claim. Letter from MetLife to C. Katz, Oct. 18, 2016, attached to Casey Decl. (ECF No. 19-2, at 120-22). In addition to restating the applicable Plan provisions, MetLife explained its denial as being based on the Death Certificate's cause of death being identified as "Combined Drug Poisoning" due to or as a consequence of "Hypothermia" and the Coroner's Report's indication that Andrew had cocaine and alcohol in his blood leading to his prolonged exposure to a cold environment. *Id.* at 120-21. MetLife concluded that since "the loss was caused by and contributed to by the use of a drug that cannot be prescribed, taken in conjunction with alcohol, the loss is not eligible as Accidental under the Plan terms." *Id.* at 121.

MetLife also responded to the initial challenge to the denial set forth by the Verbas' attorney in his request for review letter, as follows:

> Mr. Verba's Death Certificate states his immediate cause of death was due to combined drug poisoning. The claim file substantiates that finding. Specifically, the Beaver County Coroner's Autopsy Report and Postmortem Toxicology findings support the conclusion that the [] exclusion applies. The latter[] identifies positive findings in the blood for Cocaine . . . and Ethanol . . . . Additionally, the Forensic Pathologist concluded that Andrew "died as a result of a combined drug poisoning (Cocaine and Ethanol) along with hypothermia".
>
> Although hypothermia is noted on the death certificate and associated autopsy report, it was not the sole cause of the death as you contend. The records in the claim file, as referenced in this letter, support that the combined drug poisoning was the immediate cause of death, specifically the combination of cocaine and ethanol. Therefore, the plan exclusion . . does apply.

*Id.* MetLife then summarized Dr. Shane's letter report submitted as additional documentation in support of the request for a review, as follows:

> Dr. Shane states it is possible the decedent was assaulted prior to his passing. He also claims the amount of alcohol in the decedent's system was relatively low, as was the amount of cocaine in the decedent's system. Dr. Shane concludes stating the amount of alcohol and cocaine was not enough to render the decedent incapable of driving a car and that the decedent passed from hypothermia.

*Id.* MetLife then reiterates that in contrast to Dr. Shane's conclusions, the death certificate and the Forensic Pathologist identify the cause of death, respectively, as drug poisoning and combined drug poisoning (cocaine and ethanol) along with hypothermia. *Id.* MetLife also points out that, as opposed to Dr. Shane, the Forensic Pathologist examined the body. *Id.* Therefore, MetLife continued to uphold the denial of the claim based on evidence showing that both drugs and alcohol played a role in Andrew's death. *Id.* Thereafter, Plaintiffs filed the instant Complaint.

6

**III.     LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment may only be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby,* 477 U.S. 242, 248–49 (1986); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n. 3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248. In this case the parties agree on the material facts.

**IV.     DISCUSSION**

Plaintiffs contend that Andrew's death was not the result of cocaine and alcohol use; that MetLife operated under a conflict of interest as any benefits it paid would come from MetLife's own funds; and that as a result of the conflict of interest MetLife failed to retain an independent

7

toxicologist to examine the evidence. MetLife argues that the evidence it reviewed supports its decision that a combination of drug and alcohol use caused or contributed to the death and therefore denial of the claim was appropriate under the Plan's exclusion provision.

The parties do not dispute that the Plan vests discretionary authority with MetLife and that the arbitrary and capricious standard applies. Accordingly, the ultimate question before the Court is whether MetLife's denial of the Verbas' claim was arbitrary and capricious under the Plan. As explained below, after reviewing the pleadings and record evidence in light of the relevant law the Court concludes that MetLife's denial of the claim was not arbitrary and capricious.

The United States Court of Appeals for the Third Circuit instructs that where "the plan document 'gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' then the Court reviews the administrator's decision" a court "will only disturb the administrator's interpretations of ambiguous plan language when those interpretations are 'arbitrary and capricious.'" *Dowling v. Pension Plan For Salaried Employees of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 245 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1032 (2018) (internal citations omitted). As the Third Circuit noted, "[m]any cases will therefore turn, as this one does, on whether a proffered interpretation of plan language is 'reasonable.'" *Dowling*, 871 F.3d at 245.

A conflict "clear[ly]" exists when the employer "both funds the plan and evaluates the claims," because "[i]n such a circumstance, 'every dollar provided in benefits is a dollar spent by ... the employer; and every dollar saved ... is a dollar in [the employer's] pocket.'" *Id.* (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, (2008) (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987), *aff'd in part, rev'd in part on other grounds*, 489 U.S. 101, 109 S.Ct. 948 (1989))). "ERISA plan administrators are

8

fiduciaries, and 'if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether"' the administrator's benefits decision should stand." *Dowling*, 871 F.3d at 245 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948 (1989) (quoting RESTATEMENT (SECOND) OF TRUSTS § 187, cmt. d (Am. Law. Inst. 1959))). When a potential conflict of interest is raised, its existence is not determinative nor does it change the standard of review. *Dowling*, 871 F.3d at 250. The Third Circuit Court has noted that since the United States Supreme Court decision in *Glenn*, courts only "disturb an administrator's decision based on a conflict of interest if evidence either suggests the conflict actually infected the decisionmaking or if the conflict is one last straw that calls a benefits determination into question." *Id.* at 251.

1. MetLife's Decision

A review of MetLife's decision to deny benefits demonstrates that MetLife's interpretation of the Plan's language under the evidence is reasonable.

A. Denial of Benefits

In arriving at its decision to deny benefits, MetLife relied in part on the independent report of the Forensic Pathologist that stated that the cause of death was combined drug poisoning of cocaine and alcohol along with hypothermia. The death certificate reiterated that the immediate cause of death was combined drug poisoning and hypothermia.

According to the Plan, for a claim to be paid an accident must have been a "Direct and Sole Cause" of Andrew's death, which means that it must be shown that his death "was a direct result of the accidental injury, independent of other causes." ECF No. 19-2, at 242. In addition, the Plan's exclusion states that benefits will not be paid if the death is the result of "the voluntary intake or use by any means of" a drug such as cocaine, which is a drug that is never prescribed

9

by a physician. ECF No. 19-2, at 242-43. The exclusion also provides that benefits will not be paid if the death is the result of the voluntary intake or use of alcohol in combination with a drug, such as cocaine. *Id.*

The Administrative Record also includes the account of events from the Police Report. The Police Report does not provide evidence to indicate that the sole cause of death was accidental hypothermia, but does provide evidence consistent with the death being caused by, or contributed to by, combined cocaine and alcohol use. The Police Report indicates that Andrew drove to an unknown driveway, parked his car, walked through a creek, began to take off his wet clothes, and laid down on the ground. The police did not find any signs of criminal activity at the scene. In addition, Andrew was found to have a crack pipe and two small white rocks that tested positive for cocaine. The report contains circumstantial evidence that Andrew was impaired, causing him to engage in atypical behavior that eventually lead to his death by hypothermia.

While Andrew's death by hypothermia was "accidental" in the sense that Andrew did not intend to die by hypothermia, nor did an external instrumentality or person cause his death, MetLife was bound to review the Verbas' claim under the language of the Plan. Under the Plan's language, it was not unreasonable for MetLife to have concluded that accidental hypothermia was not the sole and direct cause of Andrew's death in light of evidence showing that alcohol and cocaine were present in his body, he possessed a crack pipe and cocaine rocks, and he parked his car in an unknown area, walked through a creek, stripped off his clothes, and laid down. Accordingly, the decision to deny benefits was reasonable.

    B.    <u>Toxicology Results</u>

Plaintiffs primary argument against MetLife's conclusion that the death was not a covered claim is their assertion that the amount of cocaine and alcohol reported by the

toxicology results were insufficient alone or together to cause death.  Plaintiffs rely on Dr. Shane's letter in which he opines that the toxic effects of the reported amounts of cocaine and alcohol found in Andrew's body could not have caused his death.

As noted, MetLife reviewed Dr. Shane's letter but upheld the denial of the claim based on its conclusion that Andrew's cocaine and alcohol use impaired him to a level such that he unwisely remained in an environment where he died of hypothermia.  MetLife's conclusion is rational and is supported by the substantial evidence cited above.  Dr. Shane's contrary opinion as to the effect of drugs and alcohol on the cause of death does not render MetLife's conclusion that combined cocaine and alcohol use caused or contributed to Andrew's death unreasonable, or arbitrary or capricious.

Moreover, Dr. Shane focused exclusively on whether the reported amounts of cocaine and alcohol were by themselves sufficient to cause death, whereas MetLife reviewed the evidence under the Plan's language.  Dr. Shane did not offer an opinion as to whether Andrew's combined cocaine and alcohol could have in any way contributed to his death by hypothermia.  Nor does he offer an opinion as to whether hypothermia was the *direct and sole cause* of death, such that the combined drug and alcohol in his body played *no role* in the death.  Even if Dr. Shane's conclusion that cocaine and alcohol use did not cause Andrew's death is a potentially possible conclusion, such a conclusion would only mean that more than one conclusion can be drawn from the evidence.  MetLife's conclusion arrived at after a review of the evidence is a reasonable conclusion.  When facts in the record could potentially permit multiple conclusions the Court defers to the insurance company as factfinder when its decision is reasonable.  *Malin v. Metro. Life Ins. Co.*, 845 F. Supp. 2d 606, 615 (D. Del. 2012).

C.   Conflict of Interest

Next, Plaintiffs argue that MetLife acted under an inherent conflict of interest, and that the conflict of interest worked to prevent MetLife from hiring an independent toxicologist to review the evidence. Under Supreme Court and Third Circuit law, MetLife's conflict of interest is "just another 'factor'" for the Court to consider that may "'act as a tiebreaker when the other factors are closely balanced,' or it may mean little at all, depending on the other factors at play." *Dowling*, 871 F.3d at 250 (quoting *Glenn*, 554 U.S. at 117). A Court is only permitted to "disturb an administrator's decision based on a conflict of interest if evidence either suggests the conflict actually infected the decisionmaking or if the conflict is one last straw that calls a benefits determination into question." *Dowling*, 871 F.3d at 251.

Here, the only factor that weighs in favor of Plaintiffs is the toxicology report's objective measurement levels of cocaine and alcohol found in Andrew's body. Although Plaintiffs raised an unsupported and speculative theory in their Complaint that Andrew's death was caused by nefarious and criminal activity, which Dr. Shane also raised in his report, Plaintiffs have not argued this position on summary judgment. Plaintiffs' argument generally focuses on a conclusion that Andrew's death could not have been solely caused by cocaine and alcohol use. In their Brief in Opposition addressing the conflict of interest argument, however, Plaintiffs for the first time state that "the amount of cocaine and alcohol in [Andrew's] system could not have conceivably *contributed* in any way to his death." Pls.' Br. Opp. at 2 (emphasis added) (ECF No. 29). This is not what Dr. Shane opined in his report. Moreover, the substantial evidence in the record supports MetLife's conclusion that the cocaine and alcohol use played some role in the death; that is, the drug and alcohol use contributed in some manner to Andrew's eventual death by hypothermia. The Court concludes that the factors at play are not closely balanced, and

12

therefore find that MetLife's conflict of interest as the entity that both funds and administers the Plan in this case "mean[s] little at all." *Id.* at 250.

In addition, MetLife did rely on an independent expert, the Beaver County Coroner's Office and the Forensic Pathologist that conducted the autopsy and reviewed the results of the laboratory that provided the toxicology results. Plaintiffs also concede that MetLife was under no requirement to hire an independent expert. The Court, therefore, cannot say that MetLife chose not to hire an independent expert because of the conflict of interest, or that this decision is a factor to weigh against MetLife.

Finally, Plaintiffs fail to explain how an independent expert toxicologist report might differ either from the conclusion reached by the Forensic Pathologist or the conclusion reached by Dr. Shane. In other words, it is not clear that such a report would offer any significant information not already in the possession of MetLife. At best, an independent expert would presumably be required by MetLife to review the evidence in light of the Plan's provisions. In that case it is more likely than not, under a review of all the evidence, that an independent expert would not be able to conclude that hypothermia was the direct and sole cause of Andrew's death and that cocaine and alcohol use played no role.

## V. CONCLUSION

For the foregoing reasons the Court finds that MetLife's decision to deny Plaintiffs' claim for accidental death benefits is reasonable and not arbitrary and capricious. Accordingly, MetLife's motion for summary judgment will be granted and Plaintiffs' motion for summary judgment will be denied.

An appropriate Order follows.

s/ DAVID STEWART CERCONE  
David Stewart Cercone  
United States District Judge

cc: John David Newborg, Esquire  
James L. Griffith, Esquire

(*Via CM/ECF Electronic Mail*)